UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
VIVIA AMALFITANO and                          :
GERARD AMALFITANO,
                                              :        04 CV 02027 (NRB)(THK)
                          Plaintiffs,
                                              :
          -- against –
                                              :        ECF CASE
ARMAND J. ROSENBERG
                                              :
                          Defendant.
--------------------------------------------------------------X

## **COMPLAINT**

Plaintiffs Vivia Amalfitano and Gerard Amalfitano, by their attorney Richard E. Hahn, as and for their complaint against defendant Armand J. Rosenberg, allege as follows:

### **The Parties & Subject Matter Jurisdiction**

1.      Plaintiffs Vivia Amalfitano ("Vivia") and Gerard Amalfitano ("Gerard") are married to each other and both are domiciliaries of and reside in the State of New Jersey.

2.      Defendant Armand J. Rosenberg ("Rosenberg") is a domiciliary of and resides in the State of New York.  Defendant Rosenberg is an attorney licensed to practice law in the State of New York.

3.      The subject matter jurisdiction of this Court is predicated on diversity of citizenship under 28 U.S.C. § 1332 in that the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs and is between citizens of different states.

**Summary of Claim**

4.      In this suit, plaintiffs seek to recover treble damages under Judiciary Law § 487 defendant Rosenberg arising from his prosecution against plaintiffs herein on behalf of his client, Peter Costalas, of a litigation titled *Costalas v. Amalfitano*, Supreme Court, New York County, Index No. 1105552/01 ("Costalas Litigation").  At the close of plaintiff's case at trial, the court dismissed each and every cause of action asserted against the defendants in the Costalas Litigation (plaintiffs herein) as being unsupported by any material evidence and held that defendant Rosenberg, acting on behalf of his client, Peter Costalas, had sued the wrong parties. As set forth below, defendant's conduct subjects him to liability for treble damages under New York Judiciary Law § 487.

**Background**

5.      In or about 1980, Peter Costalas and his brothers John Costalas and James Costalas formed a New York general partnership known as 27 Whitehall Street Group ("Whitehall").  At the time of its formation Peter Costalas, John Costalas and James Costalas each held a one-third interest in Whitehall.  Plaintiff Vivia Amalfitano is the daughter of James Costalas.

6.      Shortly thereafter, Whitehall acquired the real property located at 27 Whitehall Street, New York, New York.

7.      Peter Costalas, John Costalas and James Costalas acquired other properties and operated various food businesses such as restaurants, pizza parlors and delicatessens in lower Manhattan ("Family Businesses").  Each of the Family Businesses was owned equally by Peter Costalas and his brothers John Costalas and James Costalas.

8.      Beginning in the 1980s, and unbeknownst to his brothers John Costalas and James Costalas, Peter Costalas began to speculate in the stock market, primarily trading stock options.  Peter Costalas traded options first through the brokerage firm of Hertzfeld and Stern and later through the firm of Gruntal & Co. ("Gruntal").

9.      Unbeknownst to his brothers John Costalas and James Costalas and without their consent, Peter Costalas mortgaged properties owned by the Family Businesses, including Whitehall, and utilized the proceeds of those loans to speculate in the stock market, primarily in option trading.

10.     In all, Peter Costalas lost many millions of dollars which he had taken from and which belonged to the Family Businesses and which was done without the knowledge or consent of John Costalas or James Costalas.

11.     By 1992, lenders had commenced mortgage foreclosure proceedings against properties owned by the Family Businesses from which Peter Costalas had surreptitiously borrowed funds.

12.     As a result of the commencement of those foreclosure proceedings, John Costalas and James Costalas discovered for the first time that Peter Costalas had been taking funds from the Family Businesses and mortgaged the property of the Family Businesses in order to gamble in the securities markets.

13.     In or about mid-1992, John Costalas and James Costalas retained the law firm of Vincenti & Schickler ("Vincenti Firm") to defend against the mortgage foreclosure

proceedings and to seek to recover the moneys taken and lost by Peter Costalas from the Family
Businesses.

14.    Thereafter, in or about July 1992, the Vincenti Firm prepared on its
letterhead and Peter Costalas, John Costalas, James Costalas and their respective counsel
executed an agreement containing the following provision:

> Further, our respective clients have acknowledged that there are
> other lawsuits, judgments and/or potential claims and causes of
> action against them or their assets arising out of certain unilateral
> activities of Peter Costalas.
>
> These actions, legal proceedings, claims and potential claims and
> judgments and the damages losses and liabilities, actual and
> potential, which our clients have thus far sustained and which they
> may in the future sustain, are herein referred to, in part and
> collectively, as the "Liabilities".  The Liabilities have arisen, as
> between our respective clients, solely out of or in connection with
> certain actions or transactions entered into by Peter without the
> authority, knowledge or consent of John or James.
>                    * * *
> Peter agrees that he shall not have any further involvement, either
> as a shareholder, partner, director, officer or otherwise in the
> management or control of the assets including any of the business
> real estate funds or other assets in which, directly or indirectly, the
> three brothers have an interest and that any continuing involvement
> in the provision of  work or services by Peter with respect to any of
> the assets or businesses comprising the assets will be at the
> direction and under the supervision of John and James.  In this
> regard, Peter will execute any bank documents including bank
> documents pertaining to authority to sign checks, agreements or
> otherwise, necessary to effectuate the foregoing provisions in this
> paragraph.
>
> This agreement shall remain in effect until such time as the
> Liabilities shall have been, in the reasonable judgment of John and
> James, completely resolved whether by suit, settlement, payment
> or otherwise.

15.    Plaintiffs herein were unaware of this letter or its contents until it was
produced in by the Vincenti Firm in 2003 during discovery in the Costalas Litigation.

16.     In December 1992, the Vincenti Firm commenced an action in the United States District Court, Southern District of New York on behalf of John Costalas, James Costalas and certain Family Businesses against Peter Costalas, Gruntal, the broker at Gruntal who had traded on Peter's behalf, and others, seeking to recover the funds Peter Costalas had lost in his illicit option trading ("Gruntal Litigation").

17.     The summons and complaint in the Gruntal Litigation were served on Peter Costalas on or about December 4, 1992.  Plaintiffs learned only during discovery in the Costalas Litigation that Peter Costalas had been served with the summons and complaint in the Gruntal Litigation.

18.     On or about December 21, 1992, defendant Rosenberg sent a letter to the Vincenti Firm confirming that the time for Peter Costalas to respond to the summons and complaint had been extended to January 7, 1993.  Said letter contained Peter's signed admission that the summons and complaint had been served on him.

19.     Plaintiffs herein were unaware of the existence of this letter or its contents until it was produced by the Vincenti Firm in 2003 during discovery in the Costalas Litigation.

20.     On or about January 12, 1993, defendant Rosenberg again wrote to the Vincenti Firm confirming that the time for Peter Costalas to respond to the summons and complaint in the Gruntal Litigation was further extended to January 22, 1993.  Peter Costalas signed his agreement to the terms of this letter as well.

21.     Plaintiffs herein were unaware of the existence of this letter or its contents until it was produced by the Vincenti Firm in 2003 during discovery in the Costalas Litigation.

22.     On or about March 16, 1993, the Vincenti Firm sent to defendant Rosenberg a draft of an agreement prepared on its letterhead.  This draft agreement made reference to the Gruntal Litigation, as well as to "substantial losses which [Peter Costalas, John Costalas and James Costalas] have sustained in connection with certain securities investments undertaken by Peter . . ."  The draft agreement further provided that Peter Costalas agreed to sell his interest in Whitehall, and other designated Family Businesses, to John Costalas and James Costalas for $12,000, payable $1,000/month.

23.     Plaintiffs herein were unaware of the existence of this draft agreement or its contents until it was produced by the Vincenti Firm in 2003 during discovery in the Costalas Litigation.

24.     In June 1993, the claims in the Gruntal Litigation against the brokers were dismissed without prejudice by a "so ordered" stipulation.

25.     For many years prior thereto, Oscar Goldberg had acted as counsel to the Family Businesses.  On August 13, 1993, the Vincenti Firm faxed to attorney Oscar Goldberg an undated, unsigned draft of a document titled: "Agreement and Assignment."  As had the March 16, 1993 draft agreement (paragraph 22, above), this document made reference to the Gruntal Litigation, as well as to Peter Costalas's investments in stocks and stock options.  As had the March 16, 1993 draft agreement, this document also provided that Peter Costalas agreed to sell his interest in Whitehall, and other designated Family Businesses, to John Costalas and James Costalas for $12,000, payable $1,000/month.

26.     Plaintiffs herein did not know that this unsigned document existed or had been faxed from the Vincenti Firm to Oscar Goldberg until it was produced by the Vincenti Firm during discovery in 2003 in the Costalas Litigation.

27.     The Agreement and Assignment was, in fact, signed by Peter Costalas and John Costalas on or about August 13, 1993.  The Agreement and Assignment referenced the Gruntal Litigation, and pursuant to its terms Peter Costalas assigned and transferred all of his right, title and interest in 27 Whitehall Street Group, and other Family Businesses to John Costalas, and Peter Costalas resigned his partnership position in Whitehall, as well s his positions in the other Family Businesses set forth therein.

28.     In April 1994, a stipulation was entered into in the Gruntal Litigation dismissing the claims against Peter Costalas, the only remaining defendant therein, without prejudice but tolling indefinitely the statute of limitations.  That stipulation was signed by Peter Costalas, and the other signatories indicated therein, and was "so ordered" by the court.

29.     After said stipulation was filed, the Gruntal Litigation was closed, the file was transferred to the storage facility at the Office of Regional Records Services in Lee's Summit, Missouri, and therefore the court file was no longer available for inspection at the Southern District Courthouse.

30.     In 1995, Peter Costalas signed a statement prepared by his then accountant, Howard Komendant setting forth information provided by Peter Costalas.  The statement set forth in pertinent part as follows:

> In retrospect, our problems began in the late 1980's when I began investing money in the stock market.  When my losses began to mount, I began to borrow money from all of our business entitles

> to cover my losses.  I began taking mortgages on our buildings and signed on behalf of my brothers. . . .
>
> Our problems which were my market losses and [former accountant] Mr. Schwartz's assisting my brother became too much by 1991.  We lost several locations and were a party to a number of lawsuits by lenders as we defaulted on our mortgages.
>
>        \* \* \*
>
> The result of my playing the market and the obtaining these mortgages with the help of Mr. Schwartz has left me penniless. The real estate that we owned jointly has been taken over by the mortgage holders.  The businesses have closed and my brothers and I now work for my niece and nephew.

31.     Plaintiffs herein had only an unsigned copy of this statement until the statement containing Peter's signature was produced by Howard Komendant in August 2003 during discovery in the Costalas Litigation.

32.     In or about May 1995, Peter Costalas signed a handwritten statement based on information provided by him to Howard Komendant.  The statement provided in pertinent part as follows:

> I own no other businesses since due to my errors these enterprises are bankrupt.

33.     Plaintiffs herein were not in possession of a complete copy of this statement until it was produced by Howard Komendant in August 2003 during discovery in the Costalas Litigation.

34.     Peter Costalas filed income tax returns for years prior to 1993 which identified and included therein his partnership interest in 27 Whitehall Street Group.

35.     Plaintiffs herein did not know of these returns or have access to them until they were produced by Howard Komendant in August 2003 during discovery in the Costalas Litigation.

36.     In tax returns filed after 1993, Peter Costalas no longer identified and included therein a partnership interest in 27 Whitehall Street Group.

### Sale of Whitehall Property By John Costalas and James Costalas To Plaintiff Vivia Amalfitano

37.     In August 2000, Whitehall entered into a contract to sell the real property it owned at 27 Whitehall Street in Manhattan to plaintiff Vivia Amalfitano.  The contract of sale was signed by Vivia Amalfitano, and by James Costalas and John Costalas on behalf of Whitehall.  Vivia's husband, defendant Gerard Amalfitano, with offices in New City, New York, represented her in the transaction.  Whitehall was represented by the firm of Mandell, Mandell, Okin & Edelman, LLP, with offices in Lake Success, New York.

38.     The closing of title took place on or about September 28, 2000.

39.     At the closing, Vivia Amalfitano assigned her interest in the contract of sale to a corporation she had recently caused to be formed known as MSA Twins, Ltd., and Whitehall delivered a deed to MSA Twins signed by John Costalas and James Costalas on behalf of Whitehall.

40.     In addition, the mortgage on the property was refinanced, the partners in Whitehall were released from any liability on the prior mortgage, and plaintiff Vivia Amalfitano personally guaranteed the mortgage debt taken on by MSA Twins.

41.     At the closing, James Costalas and John Costalas delivered an affidavit to the purchaser attesting that Peter Costalas had assigned and transferred his partnership interest to John Costalas pursuant to an agreement dated August 1993, that by virtue of that transfer, John Costalas and James Costalas were the only partners of Whitehall, and that they were authorized to execute the closing documents for the sale of the premises.

## The Costalas Litigation

42.     On or about May 24, 2001, Peter Costalas commenced a lawsuit against Vivia Amalfitano and Gerard Amalfitano, the plaintiffs herein, in the Supreme Court of the State of New York, County of New York, styled: *Peter Costalas v. Vivia Amalfitano and Gerard Amalfitano*, Index No. 110552/01 ("Costalas Litigation").  Defendant Rosenberg represented Peter Costalas in Costalas Litigation, and defendant Rosenberg signed the complaint as attorney of record for plaintiff.  The complaint was verified by Peter Costalas.

43.     In the complaint, Peter Costalas swore that he was a partner in Whitehall at the time of the transfer of its property to MSA Twins in 2000, that he had not approved the sale of the property and that he was entitled to recover damages against Vivia Amalfitano for $4+ million and against her husband Gerard Amalfitano for $12+ million, plus punitive damages, arising out of the wrongful sale.

44.     The verified complaint in the Costalas Litigation purported to plead six causes of action against Vivia and Gerard as follows:

| Cause of Action | Description | Against | Demand |
|---|---|---|---|
| First | Fraud, conversion, fraud & perjury | Vivia & Gerard | $4,185,000 |
| Second | Fraud | Vivia & Gerard | $4,185,000 |

| Third | Conversion | Vivia & Gerard | $4,185,000 |
| Fourth | Unjust Enrichment | Vivia & Gerard | $4,185,000 |
| Fifth | Judiciary Law § 487 | Gerard | $12,555.000 |
| Sixth | Punitive Damages | Vivia & Gerard | Appropriate Amount |

45.     The defendants in the Costalas Litigation (plaintiffs herein) made a pre-answering motion to dismiss the suit based, *inter alia*, on the 1993 Agreement and Assignment by which Peter Costalas transferred his partnership interest in Whitehall to his brother John Costalas and argued, in part, that since Peter Costalas was no longer a partner in Whitehall at the time of the 2000 sale in question, he had no standing to object to the sale or the terms thereof.

46.     In opposition to that motion, defendant Rosenberg prepared, Peter Costalas signed and swore to, and defendant Rosenberg notarized an affidavit in which Peter Costalas denied that the 1993 Agreement and Assignment had any legal effect.  In his affidavit, Peter Costalas swore to the following:

> That simple piece of paper, dated August 1993, was never intended and did not ever take any effect. . . .
>
>    * * *
>
> It is an absolute fact – and defendants – who are part of the family – know this – that the piece of paper dated August 1993 never had and has no effect whatsoever on the ownership of my interest in the partnership that owns the real property.
>
>    * * *
>
> My signature was obtained by an elderly attorney who represented all three brothers and who felt that if he had such a paper in his file it might someday in the future be of value against creditors.  As noted above, it was never intended and did not divest my interest in the partnership.

47.     At his deposition, Peter Costalas testified that the "elderly attorney" referred to above was Oscar Goldberg.  Oscar Goldberg is the individual to whom the unsigned

Agreement and Assignment had been sent by the Vincenti Firm on August 13, 1993 (paragraph 25, above).

48.     Peter Costalas cross-moved for summary judgment.  Defendant Rosenberg signed the notice of cross-motion.

49.     The trial judge (Hon. Ira Gammerman) dismissed the suit holding, in part, that the suit was barred by the 1993 Agreement and Assignment and public policy estopped Peter Costalas from seeking to establish that it was executed as a sham and was not intended to have any effect other than to help to avoid potential creditors.

50.     On the appeal, Peter Costalas submitted a brief, signed by defendant Rosenberg, which stated in pertinent part as follows:

> Defendants claim that plaintiff disposed of his interest in the partnership some years ago despite the fact that <u>numerous exhibits executed under penalty of perjury for many years thereafter, conclusively show that plaintiff continued and still is a member of the partnership</u>.  The lower Court ignored all of the subsequent exhibits referred to.
>
> * * *
>
> Had the Court viewed the exhibits contained in plaintiff's Cross-Motion, it, at the minimum, should have directed a hearing on the issue of whether the document signed by plaintiff many years ago had any validity whatsoever, plaintiff having demonstrated by numerous documents contained in his papers that <u>that old piece of paper was totally invalid</u>. (emphasis supplied)

51.     The Appellate Division, First Department reversed, in part, the order of dismissal and reinstated all but the Fifth Cause of Action against Gerard Amalfitano brought under Judiciary Law § 487, holding in pertinent part:

> However, plaintiff's claim against defendant Gerard Amalfitano as an attorney, under Judiciary Law § 487(1), must fail.  Judiciary Law § 487(1) states that an attorney who is guilty of any deceit or

collusion, or consents to any deceit or collusion, with intent to deceive the court or any party is guilty of a misdemeanor and forfeits to the party injured treble damages to be recovered in a civil action.  However, the alleged deceit forming the basis of such a cause of action, if it is not directed at a court, must occur during the course of a "pending juridical proceeding" (*see Hasen v. Caffry*, 280 A.D.2d 704, 720 N.Y.S.2d 258, *lv. denied* 97 N.Y.2d 603, 735 N.Y.S.2d 492).  Since defendant attorney's alleged misconduct was related to the creation of the corporation and the execution of the transfer documents, this section is inapplicable here.

52.     The court also affirmed the denial of Peter's cross-motion for summary judgment:

Plaintiff's cross motion for summary judgment was premature prior to joinder of issue (*see* CPLR 3212; *Kantor v. Bernstein*, 225 A.D.2d 500, 502, 640 N.Y.S.2d 40).

53.     In reinstating all but the Fifth Cause of Action, the Appellate Division held in pertinent part:

[T]he motion court erred in holding as a matter of law that plaintiff must be estopped from claiming that the assignment agreement was never intended as a valid agreement.  Serious open questions remain as to the real need for and purpose of the purported assignment, and for whose benefit it was intended.  Before the court can properly conclude that plaintiff executed a sham agreement in order to defraud creditors, and therefore will be estopped from relying upon the exception to the parol evidence rule for documents which were never intended to be contracts (*see Davis v. Davis*, 266 A.D.2d 867, 697 N.Y.S.2d 888), there should be an evidentiary exploration of the circumstances surrounding the purported assignment.  Plaintiff's mere assertion that his signature "was obtained by an elderly attorney who represented all three brothers and who felt that if he had such a paper in his file it might someday in the future be of value against creditors," is insufficient to establish a need for an estoppel as a matter of law.

13

54.     After the Costalas Litigation was reinstated by the Appellate Division, the

case returned to the trial court.  On July 15, 2003, defendants in the Costalas Litigation (plaintiffs

herein) took the deposition of Peter Costalas.  Defendant Rosenberg was present at the

deposition as counsel for Peter Costalas.

55.     At his deposition, Peter Costalas gave the following testimony:

Q.     How much did you lose in the stock market?

A.     I don't know.

Q.     Did you receive in stock options?

A.     Close to that

Q.     Did you invest in stock options?

A.     No.

Q.     You never brought or sold stock options?

A.     Maybe five, ten, here and there.  Mostly stocks.

Q.     Mostly stocks?

A.     Yes.

Q.     Is it your testimony that you also lost money buying
and selling stocks, is that correct?

A.     What does that have to do with this 27 Whitehall
Street?

Q.     What does that have to do?

A.     Yes.  My money, I can do anything I want to do.  It
was my money.  Can anybody can tell you what to do with your
money?

Q.     Did the money that you invested –

A.     It was my money.  My money.  My personal
money.  And that's  20 years ago, 25 years ago.
                                    * * *
Q.     Did any of that money come from the family
businesses in which you were involved?

A.     No.

Q.     None of it?

A.      No.

Q.      Not a penny?

A.      Not a penny. . . .

Q.      Did you ever take loans out on behalf of the family businesses and use the proceeds to invest in the stock market or the option market?

A.      No.
        * * *

Q.      It helps if I could get the question out before you start answering.  I just need a simply answer.

        Did you use funds from any of the family businesses –

A.      I never used.

Q.      -- to buy or sell options or shares of stock?

A.      No.

Q.      In your own personal account?

A.      No. I never did.  I used my own money.

56.     This testimony was false and was known by defendant Rosenberg to be false at the time it was given.  However, defendant Rosenberg never sought to correct that testimony, or to advise opposing counsel or his clients that such testimony was false.

57.     At the deposition, Peter Costalas was shown a copy of the complaint in the Gruntal Litigation, with respect to which Peter Costalas gave the following testimony:

        MR. HAHN:  Let me mark as Defendants' Exhibit 18 a document titled Complaint, 92 Civ 8677.

        (Document titled Complaint, 92 Civ 8677, was marked as Defendants' Exhibit No. 18 for identification, a of this date.)
        * * *
Q.      Mr. Costalas , have you seen Defendants' Exhibit 18 prior today?

A.      What?

Q.      Have you ever seen this document before?

A.    No.  They just wanted me to –

MR. ROSENBERG: just say "yes" or "no."

A.    No, no. Do you know if they got any money?  I don't know.

MR. ROSENBERG:  Just answer the question, Peter.

A.    No.

Q.    Before today were you aware of the fact that a lawsuit had begun against you by your brothers and certain corporations in the Southern District of New York?

MR. ROSENBERG:  If he says he never saw it, how could he answer?

A.    I never saw it and I never went to court.  I never recall that I went to court facing my brothers or these jokers.  A lawyer which we took him for $200,000 and did nothing for them.  Nothing.

* * *

Q.    Were you ever served with a copy of the summons an complaint in the Costalas versus Gruntal & Company litigation?

A.    No, never did.  And I never went to court.  I never remember.  I never can recall that they were in court against my brothers or my brothers against me.

Q.    Did you ever sign any documents in that –

A.    Never signed.

Q.    You never signed any document in connection with that lawsuit?

A.    Never.  Never.  They wanted to sign a document in my name, never.

MR. ROSENBERG:  Just answer the question.

Q.    You never signed a document in connection –

A.    Never, never, never.

Q.    -- with that lawsuit?

A.    Never.

MR. ROSENBERG:  Peter, can't you just answer the question?

THE WITNESS:  No, never did.

16

58.    This testimony was false and was known by defendant Rosenberg to be false at the time it was given.  However, defendant Rosenberg never sought to correct that testimony, or to advise opposing counsel or his clients that such testimony was false.

59.    Further on in the deposition, an unfiled copy of an April 1994 executed stipulation in the Gruntal Litigation was marked as deposition Exhibit 19, and the following question were asked and answers given by Peter Costalas:

Q.    Mr. Costalas, have you reviewed Exhibit 19?

A.    I don't know what this is all about.

Q.    Is the last signature on that document yours on page 5?  Page 5, Mr. Costalas, not 4, not 3, page 5.

A.    I have to know what this is all about, please.  I see the names that don't belong here.  I didn't – they didn't have the right to sign for me.

* * *

A.    I'm not sure.  I don't know what this is all about.

Q.    I am not asking what it is about.  I'm asking whether it is your signature.

A.    No, it is not.

Q.    It is not your signature.

A.    It is not my signature.

Q.    Would you look at the first page of the document, please.  You see the initials at the bottom in the middle, J.C. and P.C.

Is P.C. your initials?

A. No.

Q.    Would you look at the second page, please, on the right-hand margin there are two initials, J.C. and P.C.

Is P.C. your initials?

A.    No. . . .

17

60.     At the time this deposition was taken, defendants in the Costalas Litigation (plaintiffs herein) had not yet obtained copies of documents in the Gruntal Litigation from the Office of Regional Records Services, Lee's Summit, Missouri, and they were not in possession of an executed copy of said stipulation showing that it had, in fact, been filed with the Court.

61.     This testimony was false and was known by defendant Rosenberg to be false at the time it was given.  However, defendant Rosenberg never sought to correct that testimony, or to advise opposing counsel or his clients that such testimony was false.

62.     Plaintiffs herein took the deposition of Peter Costalas and the depositions of four non-party witnesses, John Costalas, James Costalas, Vito Vincenti and Howard Komendant, in the Costalas Litigation.  Defendant Rosenberg defaulted in attending the depositions of Vito Vincenti and Howard Komendant.  Defendant Rosenberg took only the depositions of the opposing parties.

63.     During the period the Costalas Litigation was pending, Oscar Goldberg was living.  Defendant Rosenberg never obtained an affidavit or affirmation from, nor sought to take the deposition of Oscar Goldberg in the Costalas Litigation.

**<u>The Trial of the Costalas Litigation</u>**

64.     The non-jury trial of the Costalas Litigation commenced on October 15, 2003 before Justice Ira Gammerman.  Defendant Rosenberg tried the case on behalf of Peter Costalas.  Peter Costalas and defendant Rosenberg were present throughout the trial.

65.     During the trial, defendant Rosenberg sought to introduce in evidence a document purporting to be a tax return filed by his client, Peter Costalas.  In truth and in fact, the

document was a false and fraudulent document and was known to be such by defendant
Rosenberg at the time it was offered.

66.     Defendant Rosenberg rested plaintiff's case on October 17, 2003.  At the
conclusion of plaintiff's case, defendants therein (plaintiffs herein) moved to dismiss.  The court
granted the motion and dismissed the complaint.

67.     The court found that Peter Costalas had failed to provide proof supporting
any of the material elements of the First Cause of Action in the complaint sounding in fraud and
conspiracy.

68.     The court found that Peter Costalas had failed to provide proof supporting
any of the material elements of the Second Cause of Action in the complaint sounding in fraud
and conspiracy.

69.     The court found that Peter Costalas had failed to provide proof supporting
any of the material elements of the Third Cause of Action in the complaint sounding in
conversion and conspiracy.

70.     The court found that Peter Costalas had failed to provide proof supporting
any of the material elements of the Fourth Cause of Action in the complaint sounding in unjust
enrichment.

71.     The dismissal of the Fifth Cause of Action against Gerard Amalfitano for
violation of Judiciary Law § 487 had been affirmed by the Appellate Division on the prior
appeal.

72.     The court found that Peter Costalas had failed to provide proof with respect to any of the material elements of the Sixth Cause of Action for punitive damages in the complaint sounding in fraud.

73.     During the allocution, the court stated:

> Your client is suing the wrong people, in my opinion. The suit is against his brothers if he wants to pursue that but not against these defendants. There is no evidence that they did anything that was calculated to defraud him.

74.     On November 3, 2003 a judgment was entered dismissing the Costalas Litigation. The time to appeal from the judgment has expired.

### Applicable Statutes And Rules

75.     The Rules of the Chief Administrator of the New York courts provide in pertinent part as follows:

> § 130.1.1. COSTS; SANCTIONS
>
>       * * *
>
> (c)  For purposes of this Part, conduct is frivolous if:
>
>    (1)  it is completely without merit in law and cannot be supported by a reasonable argument for an extension, modification or reversal of existing law;
>
>    (2)  it is undertaken primarily to delay or prolong the resolution of the litigation, or to harass or maliciously injure another; or
>
>      (3)  it asserts material factual statements that are false
>
>    . . . In determining whether the conduct undertaken was frivolous, the court shall consider, among other issues, (1) the circumstances under which the conduct took place, including the time available for investigation the legal or factual basis of the conduct; and (2) whether or not the conduct was continued when its lack of legal or factual basis was apparent, should have been apparent, or was brought to the attention of counsel or the party.

§ 130-1.1-a.  SIGNING OF PAPERS

(a)  Signature.  Every pleading, written motion, and other paper, served on another party or filed or submitted to the court shall be signed by an attorney or by a party if the party  is not represented by an attorney, with the name of the attorney or party clearly printed or typed directly below the signature. . . .

(b)  Certification.  By signing a paper, an attorney or party certifies that, to the best of that person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances, the presentation of the papers or the contentions therein are not frivolous as defined in subsection (c) of section 130-1.1.

76.     The Disciplinary Rules of the Code of Professional Responsibility, regulating the conduct of New York attorneys provides in pertinent part as follows:

§ 1200.33 [DR 7-102]  REPRESENTING A CLIENT WITHIN THE BOUNDS OF THE LAW

(a)  In the representation of a client, a lawyer shall not:

(1)  File a suit, assert a position, conduct a defense, delay a trial, or take other action on behalf of the client when the lawyer knows or when it is obvious that such action would serve merely to harass or maliciously injure another.

(2)  Knowingly advance a claim or defense that is unwarranted under existing law, except that the lawyer may advance such claim or defense if it can be supported by good faith argument for an extension, modification, or reversal of existing law.

(3)  Conceal or knowingly fail to disclose what which the lawyer is required by law to reveal.

(4)  Knowingly use perjured testimony or false evidence.

(5)  Knowingly make a false statement of law or fact.

(6)  Participate in the creation or preservation of evidence when the lawyer knows or it is obvious that the evidence is false.

(7)  Counsel or assist the client in conduct that the lawyer knows to be illegal or fraudulent.

(8)  Knowingly engage in other illegal conduct or conduct contrary to a disciplinary rule.

(b)  A lawyer who receives information clearly establishing that:

(1)  The client has, in the course of the representation, perpetrated a fraud upon a person or tribunal shall promptly call upon the client to rectify the same, and if the client refuses or is unable to do so, the lawyer shall reveal the fraud to the affected person or tribunal, except when the information is protected as a confidence or secret. . . .

## I

### Claim For Relief Under
### New York Judiciary Law § 487

77.     Plaintiff repeats and realleges each and every allegation set forth in

paragraphs 1-76, above, as though expressly set forth herein at length.

78.     Judiciary Law § 487 provides as follows:

§ 487.  MISCONDUCT BY ATTORNEYS

An attorney or counselor who:

1.  Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party; or

2.  Wilfully delays his client's suit with a view to his own gain; or, willfully receives any money or allowance for or on account of any money which he has not laid out, or becomes answerable for,

Is guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action.

79.     From the time the Costalas Litigation was commenced through the

dismissal of the suit at trial defendant Rosenberg, in collusion with Peter Costalas, deceived the

New York courts and the plaintiffs herein by seeking to sustain the suit with totally bogus claims

unsupported by competent evidence, with fraudulent evidence known by him to be false and by

permitting his client Peter Costalas, without objection or correction, to give perjurious testimony known by defendant Rosenberg to be materially false and fraudulent and then using such perjurious testimony to support legal arguments in documents signed by him in supporting the meritless claims of his client.  Such conduct was chronic and persistent.

80.     As part of that chronic pattern and plan of deception and fraud perpetrated against the court and plaintiffs herein, defendant Rosenberg, on his own and in concert with his client Peter Costalas did, among others activities, engage in the following conduct in violation of Judiciary Law § 487:

a.     Signed the verified complaint, thereby certifying that that he had determined, after reasonable inquiry, that the factual allegations in the complaint were true and that the causes of action pleaded were not completely without merit in law.  In fact, defendant Rosenberg knew that there was no competent evidence to support any of the material element of any of the causes of action contained in the complaint.

b.     The Judiciary Law § 487 cause of action asserted against Gerard Amalfitano, and which was dismissed by the trial court and the dismissal affirmed on appeal, was completely without merit in law because the wrongdoing alleged did not take place within a litigation.

c.     The claim made by Peter Costalas that the Agreement and Assignment had been executed at the suggestion of an attorney, Oscar Goldberg, in order to protect Peter Costalas from future creditors was a total fabrication, and at all times pertinent herein defendant Rosenberg knew it to be the case.  Nevertheless, defendant Rosenberg submitted the perjurious affidavit of Peter Costalas containing that sworn

claim to the trial court and relied on it in the appellate brief he signed.  Raising and

pursuing that false claim caused the Appellate Division to reverse the dismissal of the

Costalas Litigation finding that "there should be an evidentiary exploration of the

circumstances surrounding the purported assignment."  At all times during the Costalas

Litigation, defendant Rosenberg knew that the Agreement and Assignment had not been

executed for the reasons sworn to by his client and that, in fact, the agreement had been

intended as a fully binding and effective transfer in 1993 of Peter Costalas's interest in

Whitehall to his brother John Costalas.

        d.     At his deposition taken in the Costalas Litigation, Peter Costalas

testified falsely, first that he had not invested in stock options, second, that the moneys he

had lost belonged to him personally and did not belong to any of the Family Businesses

and third, that he had never taken loans out on behalf of the Family Businesses and used

the proceeds to invest in the stock market or options market.  Defendant Rosenberg

permitted that testimony to stand unchallenged and uncorrected, in spite of the fact that

he was well aware on personal knowledge that his client had invested in stock options,

had used Family Business monies to make such investments and that he had taken out

loans using property owned by the Family Businesses as collateral.

        e.     At his deposition taken in the Costalas Litigation, Peter Costalas

testified falsely that his brothers and certain family businesses had never brought a

lawsuit against Gruntal.  Defendant Rosenberg permitted that testimony to stand

unchallenged and uncorrected, in spite of the fact that he was well aware on personal

knowledge that such lawsuit had been commenced, and, in fact, defendant Rosenberg earned attorneys' fees in connection with that litigation.

f.      At the deposition of Peter Costalas taken in the Costalas Litigation, defendant Rosenberg permitted his client's perjurious testimony to stand unchallenged and uncorrected that Peter Costalas had never been served with the summons and complaint in the Gruntal Litigation.  In fact, defendant Rosenberg knew that his client had been served with the summons and complaint.

g.      At the deposition of Peter Costalas taken in the Costalas Litigation, Peter Costalas denied that his signature and initials appeared on a stipulation of dismissal filed in the Gruntal Litigation.  At the trial of the Costalas Litigation, Peter Costalas again denied that his signature or initials appeared on the document.  The document was authenticated by another witness as containing the signature and initials of Peter Costalas and was admitted in evidence.  Defendant Rosenberg knew that the stipulation of dismissal contained the signature and initials of his client, and yet he took no action to challenge his client with respect to this testimony or to correct his client's perjurious testimony.

h.      At the deposition of Peter Costalas taken in the Costalas Litigation, Peter Costalas denied that he had signed the document referred to in paragraph 30, above. This testimony was false.  Defendant Rosenberg was fully familiar with his client's signature and had notarized it on numerous occasions, and he knew that his client's testimony was false.  However, defendant Rosenberg permitted the testimony to stand

unchallenged, and he took no action to correct it either at the deposition or subsequent thereto.

i.      At trial, defendant Rosenberg sought to offer in evidence a document purporting to be the tax return of Peter Costalas.  Defendant Rosenberg knew at the time he offered the document in evidence that it was bogus and fraudulent.

j.      On the initial pre-answering motion to dismiss made by defendants in the Costalas Litigation (plaintiffs herein), defendant Rosenberg prepared and served a cross-motion for summary judgment on behalf of his client, Peter Costalas.  Such cross-motion was totally frivolous and contrary to law because under New York Civil Practice Law and Rules § 3212(a), a motion for summary judgment can be made only after issue is joined, and the Appellate Division so held on the appeal taken by defendant Rosenberg from the trial court's initial dismissal of the Costalas Litigation.

81.    All of the above actions and other conduct of defendant Rosenberg constitutes a chronic and extreme pattern of legal delinquency in violation of Judiciary Law § 487.

82.    The Costalas Litigation was entirely without merit from the time of its commencement to the date of its dismissal.  However, the defendants therein (plaintiffs herein) were required to defend themselves against claims in excess of $12 million through motions, an appeal, extensive discovery and a trial.

83.    In defending themselves in this litigation, they incurred legal expenses in excess of $85,000, all of which have been fully paid.

84.     Under New York Judiciary Law § 487, plaintiffs are entitled to recover from defendant Rosenberg the fees and expenses paid by them in defense of the Costalas Litigation, plus interest, and that total trebled.

**WHEREFORE**, plaintiffs Gerard Amalfitano and Vivia Amalfitano demand judgment against defendant Armand Rosenberg for the following relief:

A.     The total legal fees and expenses paid by plaintiffs herein in connection with their defense of the Costalas Litigation, which total approximately $85,000, plus interest at the rate of nine percent per annum from the date of each payment of fees and expenses, and the total amount then trebled;

B.     Punitive damages in an amount to be determined by the Court;

C.     Such other, further and different relief as to the Court may seem just and proper, including the costs and disbursement of this action.

Dated: New York, New York
        March 16, 2004

s/_____
Richard E. Hahn (RH-5431)
  Attorney for Plaintiffs
444 Madison Avenue, 27th Floor
New York, New York 10022
  212-826-8200